D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BEVERLY KIRBY

**MEMORANDUM & ORDER**
**07-cv-2768(NGG)**

Plaintiff,

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 9 - 2009 ★

**BROOKLYN OFFICE**

-against-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.
-------------------------------------------------------------------X

**NICHOLAS G. GARAUFIS, United States District Judge.**

Beverly Kirby ("Plaintiff" or "Kirby") brings this action for judicial review pursuant to

42 U.S.C. § 405(g) challenging the final determination of Defendant Commissioner of Social

Security Michael J. Astrue ("Commissioner" or "Defendant") to deny her disability insurance

benefits under Title II of the Social Security Act. The parties have cross-moved for judgment on

the pleadings. The issues before the court are: (1) whether the Administrative Law Judge

("ALJ") violated the treating physician rule, (2) whether the ALJ erred in assessing Plaintiff's

credibility and subjective experience of pain, (3) whether the ALJ improperly relied on the

opinion of Dr. Mohammed Khattak ("Dr. Khattak"), a discredited medical consultative

examiner, and (4) whether the Commissioner satisfied his burden of proof to demonstrate that

Plaintiff has the residual functional capacity ("RFC") for the full range of sedentary work. For

the reasons set forth below, the case is remanded for the ALJ to clarify the weight given to Dr.

Khattak's opinion and to set forth additional facts supporting his determination that Plaintiff has

the RFC to perform the full range of sedentary work.

## I. Procedural History

On July 19, 2002, Plaintiff filed an application for disability insurance benefits, claiming she was unable to work due to multiple body pains. (Transcript of the Record ("Tr.") at 125-27.) The Social Security Administration ("SSA") denied the claim on October 17, 2002. (Id. at 66.) Plaintiff then requested a hearing. Plaintiff appeared with representation and testified at the hearing before ALJ Andrew S. Weiss (the "ALJ") on January 24, 2005. (Id. at 290-334.) The ALJ's decision, issued on May 12, 2005 (the "First Decision"), denied Plaintiff benefits. The ALJ held that Kirby was not disabled within the meaning of the Social Security Act. (Id. at 61.)

On May 23, 2005, Plaintiff requested review of the First Decision by the Appeals Council. (Id. at 114-15.) On December 2, 2005, the Appeals Council remanded the matter for further proceedings. (Id. at 119-22.) Plaintiff appeared with her attorney and testified at a second hearing ("Second Hearing") before ALJ Weiss on August 1, 2006. (Id. at 335-64.) Following the Second Hearing, ALJ Weiss issued a second decision on September 19, 2006 (the "Second Decision"). (Id. at 17-27.) ALJ Weiss again held that Kirby was not disabled within the meaning of the Social Security Act. (Id. at 26.) ALJ Weiss determined that the Plaintiff had not engaged in substantial gainful activity since the onset of her medically determinable severe impairments. (Id.) However, these impairments, alone or in combination, did not meet or exceed the requirements of any listed impairments. (Id.) The ALJ held that Kirby was unable to return to her past relevant work, which the ALJ classified as "light to medium," but that she was capable of performing the full range of sedentary work. (Id.)

The Second Decision became final on May 18, 2007, when the Appeals Council denied Plaintiff's request for review. (Id. 6-8.) This action followed.

## II. Personal and Vocational History

Plaintiff was born in 1957 and was forty-eight years of age at the time the Second Decision was issued. (Id. at 21.) She graduated from high school and obtained a certificate in dietetics from the New York Institute of Dietetics in 1980. (Id. at 341.) She worked for fifteen years at North Shore Hospital in Forest Hills, Queens as a food service coordinator. (Id. at 295, 341.) Plaintiff testified that her job entailed fixing food trays, loading the 10-pound trays into a thermal truck, and pushing the 200-pound thermal truck. (Id. at 296.) Plaintiff testified that she considered her work exertionally light, but the vocational expert at the first hearing classified the work as exertionally medium. (Id. at 330.) Plaintiff alleged an onset of disability on May 18, 2001 due to pains in her lower back, neck and right hand. (Id. at 341-342.) Plaintiff stopped working at some point after May 2001.[1]

## III. Medical History

### A. Treating Physicians in New York

Plaintiff first sought treatment from Dr. Victor Chehebar ("Dr. Chehebar"), a neurologist, on May 2, 2001. (Id. at 178-79.) Plaintiff complained of numbness and tingling in the right arm and numbness, tingling and intermittent weakness involving the left leg, both of which had been occurring for three to four weeks prior. (Id. at 178.) Plaintiff also complained of chronic left hip pains which had affected her for the past two to three years. (Id.) Neurological examination revealed positive Tinel sign overlying the right ulnar nerve at the ulnar groove. (Id. at 178-79.) Examination of the left hip revealed pain on flexion and abduction, and limited external rotation of the left hip. (Id.) Sensory examination revealed decreased cold in the left sciatic nerve distribution. (Id. at 179.) Dr. Chehebar noted that the Plaintiff specifically denied any lower back pains. (Id. at 178.) Dr. Chehebar's overall impression was that Plaintiff suffered right

---

[1] The exact date Plaintiff stopped working is a subject of dispute discussed infra p. 28.

ulnar nerve compression at the elbow and left hip musculoskeletal dysfunction with possible internal derangement and secondary sciatic nerve compression at the level of the hip. (Id. at 179.) Dr. Chehebar recommended physical therapy, an orthopedic evaluation and consideration of cortisone injections for the left hip. (Id.) Dr. Chehebar prescribed Skelaxin, Vioxx, and Ultrax, and a heelbow pad for the right elbow. (Id.)

On May 8, 2001, Dr. Chehebar performed electromyogram and nerve conduction (EMG/NCV) studies of Plaintiff's lower extremities and right upper extremity. (Id. at 175.) Results were normal. (Id.) Sensory nerve conduction values could not be obtained in the left sural nerve. (Id.)

On May 18, 2001, Plaintiff complained to Dr. Neil J. Koppel ("Dr. Koppel"), her chiropractor, that she had stabbing pins and needles radiating from her lower back into the left leg, left knee and left ankle, following an injury sustained on the job two years earlier. (Id. at 236.) Upon palpation examination, pain and tenderness were noted in the cervical, thoracic and lumbar spine as well as the left knee, leg and ankle. (Id.) Dr. Koppel opined that improper training in how to correctly push and pull food carts was the cause of Plaintiff's injuries, which he called cumulative stress disorders. (Id.) Dr. Koppel opined that such injuries have no true date of injury, but a gradual onset leading to severe trauma. (Id.) On May 21, 2001, an x-ray of Plaintiff's right elbow ordered by Dr. Koppel showed no evidence of fracture or dislocation and soft tissues were unremarkable. (Id. at 192.)

On June 6, 2001, Plaintiff underwent a cervical spine MRI ordered by Dr. Chehebar. (Id. at 176, 177, 191, 215.) The MRI showed C5-6 disc herniation w/ slight lateralization towards the right. (Id.) Overall, the cervical cord was intrinsically normal. (Id.) The MRI showed no

evidence of cervical cord compression, no paraspinal mass or cervical adenopathy present. (Id.) Vertical body height and signal intensity were maintained throughout spine. (Id.)

On June 27, 2001, Plaintiff complained to Dr. Chehebar of progressively worsening right elbow pain, numbness and tingling in the last two digits of her right hand, and increased neck and back pains. (Id. at 171, 238.) Plaintiff attributed her symptoms to repetitive strain syndrome caused by her work duties. (Id.) Dr. Chehebar noted that Plaintiff had a limited range of motion in her neck. (Id.) Plaintiff's motor function was at full strength (5/5) and symmetric. (Id.) He noted that her gait and coordination tested normally. (Id.) Dr. Chehebar diagnosed right elbow tendonitis with right ulnar nerve compression at the elbow, cervical radiculopathy resulting from C5-6 disc herniation, and lumbar strain. (Id. at 172, 239.) Dr. Chehebar recommended physical and occupational therapy, an orthopedic hand evaluation, possible cortisone injections and future neurosurgical evaluation and intervention. (Id.) Dr. Chehebar prescribed Celebrex, Vicodin, and SOMA. (Id.)

On July 16, 2001, Dr. Robert Gluck ("Dr. Gluck"), a specialist in hand and upper extremity disorders, examined Plaintiff on referral from Dr. Chehebar. (Id. at 183-84.) Plaintiff complained of neck and shoulder problems which had affected her for the past four to five months. (Id. at 183.) Plaintiff attributed these problems to repetitive stress injury related to her job duties. (Id.) Dr. Gluck wrote that Plaintiff "is presently working," and that Vicodin had provided Plaintiff with some pain relief. (Id.) Upon examination, Dr. Gluck found that the range of motion of the Plaintiff's right elbow was complete in extension and flexion, and that there was no evidence of instability. (Id.) Dr. Gluck found discrete tenderness at the area of the right lateral epicondyle with only minimal discomfort in the area of the radial tunnel. (Id.) Additionally, a neurovascular exam was "grossly unremarkable." (Id. at 184.) Dr. Gluck

diagnosed lateral epicondylitis in the right elbow and recommended that the patient wear a wrist splint on a constant schedule, warm water soaks, local massage, and consideration of a steroid injection if the symptoms persisted with no improvement in the following weeks. (Id.)

On January 21, 2002, Plaintiff saw Dr. Chehebar for a follow-up of her neck pain and pain and numbness in her right arm. (Id. at 237.) Plaintiff's condition remained unchanged. (Id.) Dr. Chehebar diagnosed Plaintiff with cervical radiculopathy and cervical disc herniation, and he wrote that Plaintiff "remained disabled" at that time. (Id.) He advised Plaintiff to continue her medicine therapy and epidural blocks. (Id.)

On May 6, 2002, Dr. Gluck examined Plaintiff and determined that her right elbow epicondylitis had recurred despite her brace. (Id. at 181.) Dr. Gluck recommended a 4-6 week course of therapy. (Id.)

On June 18, 2002, Plaintiff had a neurological follow-up appointment with Dr. Jill Bressler ("Dr. Bressler"), a neurologist associated with Dr. Chehebar's office. (Id. at 170.) Dr. Bressler noted that Plaintiff's condition remained unchanged. (Id.) Dr. Bressler opined that the "patient has a partial disability and is unable to work at this time due to her injuries." (Id.) Dr. Bressler advised Plaintiff to continue with medicine therapy and epidural blocks. (Id.)

On June 26, 2002, Dr. Gluck reported that Plaintiff was "much improved." (Id. at 180.)

**B. Disability Assessments**

On August 30, 2002, Dr. Jeffrey Schwartz ("Dr. Schwartz"), Plaintiff's treating chiropractor, completed a disability questionnaire for the New York Office of Temporary and Disability Assistance. (Id. at 196-203.) He reported that he first examined Plaintiff on July 11, 2001 and had last examined the patient on July 15, 2002. His treating diagnosis was cervical spine and lumbar spine derangements, with symptoms of pain and limited range of motion, for

which Plaintiff was treated with physical therapy three times a week. (Id. at 196.) Dr. Schwartz made no clinical finding of muscle spasm, ankylosis, sensory or motor deficits, and no muscle wasting or atrophy. (Id. at 197.) Dr. Schwartz opined that Plaintiff could occasionally lift and carry up to fifteen pounds, stand or walk up to eight hours per day, sit for up to eight hours a day, and push or pull less than twenty pounds with her upper extremities. (Id. at 199.) He found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Id.)

On September 25, 2002, Dr. Khattak, an orthopedic physician and consultative examiner for the Division of Disability Determinations, examined Plaintiff. (Id. at 204-05. Plaintiff complained of constant pain in her neck radiating down the right arm and pain in her lower back for one year. (Id. at 204.) Plaintiff reported doing her own self-care and going to physical therapy twice a week. (Id.) She reported that she "stays home and rests," and that her sister helps her with household chores and shopping. (Id.) Dr. Khattak reported that Plaintiff was wearing a back brace, and was currently taking Vicodin twice daily. (Id.) Dr. Khattak reported that Plaintiff was not in acute distress. (Id.) Her gait was steady, she was ambulating without assistance, and she got on and off the examination table without assistance. (Id.) Dr. Khattak reported that the curvature of Plaintiff's cervical spine was normal, and her deep tendon reflexes were symmetrical. (Id.) Range of motion in her shoulders was normal, and Phalen and Tinel signs were negative. (Id.) Straight-leg raising[2] was negative bilaterally. (Id.) Dr. Khattak reported that there were no sensory or motor deficits, and no muscle atrophy. (Id.) Dr. Khattak reported that, based on the examination, Plaintiff's ability to bend and lift were mildly limited,

---

[2] The straight-leg raise is a test done during the physical examination to determine whether a patient with low back pain has an underlying herniated disk. See Clinical Correlations: The NYU Internal Medicine Blog, http://www.clinicalcorrelations.org/?p=337 (last visited July 8, 2009).

but that there were no limitations in sitting, standing, walking, or reaching with gross and fine manipulations in her hands. (Id. at 205.)

On October 8, 2002, Plaintiff underwent a Residual Functional Capacity ("RFC") Assessment. (Id. at 206-13.) A Disability Determination Service physician ("DDS Physician") evaluated Plaintiff's limitations.[3] (Id.) The DDS Physician found that Plaintiff was fully ambulatory with normal gait. (Id. at 207.) She had exertional limitations with regard to frequently lifting and carrying more than ten pounds, standing and walking a total of six hours of an eight-hour workday, and sitting about six hours in an eight-hour workday. (Id.) Plaintiff had no exertional limitations in pushing or pulling. (Id.) The DDS Physician reported that Plaintiff could occasionally climb and stoop, and frequently balance, kneel, crouch or crawl. (Id. at 208.) The DDS Physician reported no manipulative, visual, communicative or environmental limitations. (Id. at 209-10.) The DDS Physician found that Plaintiff had a full range of motion throughout and that her joints were normal. (Id. at 209.) Phelen and Tinel signs were negative. Additionally, the DDS Physician evaluated the statements from Plaintiff's treating and examining sources. (Id. at 212.) The DDS Physician reported that both Dr. Khattak and Dr. Schwartz had offered opinions concerning Plaintiff's RFC. (Id.) The DDS Physician declared that Dr. Khattak's consultative opinion was "of little probative value," because it was "vague." (Id.) The DDS Physician gave Dr. Schwartz's opinion greater weight because Dr. Schwartz was one of Plaintiff's treating physicians and his opinion was predominantly supported by medical evidence. (Id.)

On October 17, 2002, the Commissioner denied Plaintiff's application for disability insurance benefits. (Id. at 66.)

---

[3] The name of the DDS Physician is unfortunately absent from the record. The DDS Physician's signature is on the form, but is illegible and there is no type-written name beneath. (Tr. at 213.)

## C. Medical Assessments after Denial of Plaintiff's Application for Benefits

On February 11, 2003, Plaintiff underwent an MRI of her left knee, which showed a sprain in the medial collateral ligament. (Id. at 216.) The results showed no evidence of meniscus tear, and Plaintiff's bony structures were normal. (Id.)

On February 14, 2003, Dr. Joseph Jeret ("Dr. Jeret"), a neurologist, conducted EMG/NCV testing. (Id. at 223.) The study was abnormal; Dr. Jeret diagnosed potential mononeuritis multiplex and recommended that Plaintiff be evaluated for rheumatologic disease. (Id.) Dr. Jeret noted that Plaintiff's lumbar MRI was normal. (Id.)

On March 29, 2003, Dr. Lionel Desroches ("Dr. Desroches"), specialist in internal medicine, hypertension and kidney diseases, reported in a letter that he had followed Plaintiff "for the past few years." (Id. at 244.) He reported that Plaintiff suffered from back and lower extremity numbness, and he opined that EMG showed neuropathy of the peroneal nerve. (Id.) Though he acknowledged that her MRI was normal, he opined that he believed nerve damage caused Plaintiff constant pain and prevented her from walking properly. (Id.) He further opined that she was "totally disabled." (Id.)

In a letter dated April 4, 2003, Dr. Schwartz wrote that he had treated Plaintiff from July 6, 2001 to December 19, 2002. (Id. at 229.) He diagnosed cervical and lumbar derangement, and he noted "Rule out Radiculopathy." (Id.) Dr. Schwartz opined that Plaintiff was "unable to do any kind of work due to her work-related accident" on June 21, 2001. (Id.)

On August 18, 2003, Dino Lontoc ("Lontoc"), Plaintiff's physical therapist, assessed Plaintiff's ability to do work-related activities. (Id. at 217-219.) He opined that Plaintiff could occasionally lift and carry up to ten pounds due to spasms in paralumbar muscles and 4/5 strength in her back extensors. (Id. at 217.) He opined that Plaintiff could stand for a total of

thirty-minutes-to-one-hour of an eight-hour workday, but only for thirty minutes without interruption. (Id.) Plaintiff could sit for six hours of an eight-hour workday, but only for one hour without interruption. (Id. at 218.) Plaintiff could occasionally balance, but she could never climb, kneel, crouch, stoop or crawl due to her weak back muscles. (Id.) Plaintiff was environmentally restricted from jobs involving heights, moving machinery, temperature extremes and vibrations. (Id. at 219.)

### D. Treating Physician in Florida

After Plaintiff moved to Florida in 2002, she begin to regularly see Dr. Amarilis Torres ("Dr. Torres"), a rheumatologist. On December 11, 2003, Dr. Torres assessed Plaintiff's ability to do work-related activity. (Id. at 220-222.) Dr. Torres opined that Plaintiff could lift and carry five-to-seven pounds, but not on a regular basis, due to cervical spine degenerative disease and bilateral arm-muscle atrophy produced by radiculopathy. (Id. at 220.) She opined that Plaintiff could stand or walk for up to two hours total in an eight-hour workday, for thirty minutes without interruption, and could sit for a total of four hours in an eight-hour workday, for thirty minutes without interruption. (Id. at 221.) Dr. Torres noted that Plaintiff's daily use of muscle relaxants and narcotics would compromise her alertness and limit potential work environments involving heights or moving machinery. (Id. at 221-22.) Plaintiff was also environmentally restricted from temperature extremes, humidity and vibrations due to her arthritis. (Id. at 222.) Plaintiff was physically limited from reaching, handling, feeling, pushing, and pulling. (Id. at 221.) Dr. Torres reported that Plaintiff could never climb, stoop, balance, crouch or crawl, but could occasionally kneel. (Id.)

On February 9, 2004, Dr. Torres examined Plaintiff for her complaint of right-sided neck pain radiating to her right shoulder blade. (Id. at 288.) Plaintiff stated that physical therapy and

epidural injections into her cervical spine had led to "very short lived improvement." (Id.)
Musculoskeletal examination revealed that Plaintiff's cervical spine had a normal range of
motion, Plaintiff's shoulders were neither warm nor tender to palpation, and Plaintiff's grip was
bilaterally normal. (Id.) Range of motion for Plaintiff's upper extremities was normal. (Id.) Dr.
Torres diagnosed the patient with cervical spine degenerative joint disease/degenerative disc
disease with right-sided radiculopathy and a possible liver lesion. (Id.) Dr. Torres recommended
that Plaintiff receive a neurosurgical evaluation and a liver CT scan. (Id.) Plaintiff had prior
CT scans which are not included in the record. The abdominal CT scan on February 20, 2004
showed no specific change in non-specific small hypodensity lesion in the right lobe of
Plaintiff's liver since Plaintiff's last CT on October 31, 2003. (Id. at 287.)

On April 6, 2004, Dr. Torres examined the patient in a follow-up appointment for
Plaintiff's continued parasthesias in her right arm and pain in her neck. (Id. at 286.) Dr. Torres
noted that patient was "in no obvious discomfort." (Id.) Dr. Torres reported reduced range of
motion in Plaintiff's cervical spine, L4-L5 vertebral level tenderness and bilateral paravertebral
muscle tenderness in lower back. (Id.) There was S1 joints tenderness bilaterally in Plaintiff's
hips. (Id.) Straight-leg raising was negative bilaterally. (Id.) Dr. Torres' diagnoses remained
unchanged. (Id.) Dr. Torres added Voltaren, an anti-inflammatory, to Plaintiff's medication
regimen. (Id.)

Dr. Torres next examined Plaintiff on July 6, 2004. (Id. at 283-84.) Plaintiff complained
of a new onset of left knee pain. (Id. at 283.) Musculoskeletal examination showed no swelling
or warmth in Plaintiff's knees. (Id. at 284.) Plaintiff reported that intermittent pain in her left
shoulder blade was frequently relieved by massage and stretching. (Id. at 283.) Dr. Torres noted
left side paravertebral muscle tenderness in Plaintiff's thoracic spine and tenderness in the left

hip. (Id. at 284.) Dr. Torres noted that straight-leg raising was negative bilaterally. (Id.) Dr.

Torres recommended left knee MRI to exclude possibility of meniscal tear. (Id.) Dr. Torres

reported that Plaintiff's cervical spine degenerative joint disease was "very much asymptomatic."

(Id.) Again, Dr. Torres noted that Plaintiff was "in no obvious discomfort." (Id. at 283.) A left

knee MRI on July 9, 2004 was normal, with no evidence of meniscal tear or significant

degeneration. (Id. at 285.)

Plaintiff again saw Dr. Torres on August 11. (Id. at 281-82.) Plaintiff complained of

more discomfort in neck and lower back, "but not anything that is making her dysfunctional."

(Id. at 281.) Musculoskeletal examination revealed that Plaintiff's cervical spine had a reduced

range of motion; her lumbosacral spine was tender to palpation at the L5-S1 vertebral level. (Id.

at 281-82.) Dr. Torres reported that Plaintiff's upper extremity range of motion was normal and

straight-leg raising was negative bilaterally. (Id. at 281.) Dr. Torres noted that Plaintiff's lower

back pain was stable on her present medication and that Plaintiff's degenerative disc disease was

"significantly asymptomatic." (Id. at 282.) At that time, Plaintiff's medications were Demerol,

Zanaflex, and Voltaren. (Id. at 281.)

On January 6, 2005, Dr. Torres assessed Plaintiff's ability to perform work-related

activities. (Id. at 245-46.) Dr. Torres opined that the Plaintiff could stand or walk for two hours

total in an eight-hour workday, and for thirty minutes without interruption. (Id. at 245.) Plaintiff

could sit for four hours in an eight-hour workday, and for thirty minutes without interruption.

(Id.) Plaintiff could never climb, stoop, balance, crouch, crawl, but could occasionally kneel.

(Id.) Dr. Torres reported that reaching, handling, feeling, pushing, and pulling were affected by

the impairment, but seeing, hearing and speaking were not. (Id. at 246.) Because Plaintiff's

medications might compromise alertness or balance, she could not work with heights or heavy

machinery. (Id.) Plaintiff's arthritis hindered exposure to temperature extremes, vibrations and humidity. (Id.)

At the January 6, 2005 evaluation, Plaintiff complained to Dr. Torres of left leg pain for the past week that worsened with walking or standing. (Id. at 272.) Plaintiff reported that elevating her leg on pillow helped alleviate the pain. (Id.) Plaintiff also complained of morning stiffness in her elbows, wrists and hands that would last for about thirty minutes. (Id.) Dr. Torres again noted that Plaintiff was "in no obvious discomfort." (Id.) Musculoskeletal examination revealed bilateral elbow tenderness and tenderness in Plaintiff's thoracic and lumbosacral spine. (Id. at 272-73.) Range of motion in Plaintiff's upper extremities was normal and straight-leg raising was negative bilaterally. (Id. at 272-73.) Dr. Torres diagnosed Plaintiff with probable inflammatory polyarticular arthritis and prescribed a short trial of Prednisone. (Id. at 273.)

Plaintiff visited Dr. Torres on March 3, 2005 and complained of parasthesias in her left foot with some weakness and arthralgias in her right foot that had prevented walking for two days. (Id. at 270-71.) Dr. Torres noted that straight-leg raising was negative bilaterally. (Id. at 270.) Plaintiff reported that the short course of Prednisone had somewhat relieved her joint pain, but she had not started a full course because she feared ophthalmologic side effects. (Id.) Plaintiff listed no medications at this time. (Id.) Musculoskeletal exam revealed lower back tenderness to palpation, left-sided paravertebral muscle tenderness, and left-sided sciatic notch tenderness. (Id.) Dr. Torres injected Plaintiff's left hip with Depo-Medrol, an anti-inflammatory, and Lidocaine, a local anesthetic. (Id. at 271.)

Plaintiff visited Dr. Torres on April 20, 2005 and stated that she "remained well." (Id. at 268-69.) Plaintiff reported that Prednisone had completely resolved her stiffness and improved

13

her pain. (Id. at 268.) Plaintiff complained of increased arthralgias in her hands. (Id.) No symptoms or conditions were noted on physical examination. (Id.) Plaintiff's upper extremity range of motion was normal, straight-leg raising was negative bilaterally, and Plaintiff had no vertebral tenderness. (Id. at 268.) Dr. Torres noted that Plaintiff was "in no obvious discomfort." (Id.) Dr. Torres' impressions were inflammatory polyarticular arthritis, positive anti-nuclear antibody, with no clear-cut evidence of rheumatoid arthritis or systemic lupus erythematosus. (Id. at 269.) Dr. Torres recommended an MRI of the brain to rule out the possibility of demyelinating diseases. (Id.) The MRI was normal. (Id. at 267.)

On July 13, 2005, Dr. Torres examined Plaintiff and determined that the range of motion in the upper extremities was normal. (Id. at 265.) Dr. Torres noted decreased pulses in both legs and left leg swelling. (Id.) Dr. Torres ordered a Doppler study and injected Plaintiff's left hip with Depo-Medrol and Lidocaine. (Id. at 266.) The Doppler study was normal. (Id. at 276-80.)

On September 12, 2005, Plaintiff visited Dr. Torres and complained of persistent left leg pain that injections had relieved only temporarily. (Id. at 249-50, 255-56, 264-65.) Plaintiff stated that pressing on the area helped relieve her pain, but that walking hurt. Patient also complained of intermittent swelling in her left foot that was unaffected by Prednisone. Dr. Torres noted that Plaintiff was "in no obvious discomfort." (Id. at 249, 255, 264.) Range of motion of Plaintiff's upper extremities was normal. (Id. at 249, 255, 264.) Dr. Torres diagnosed left hip bursitis, and prescribed a trial of Azulfidine. (Id. at 250.) Dr. Torres also requested an MRI of Plaintiff's left foot to rule out the possibility of a tendon tear. (Id.) A September 15, 2005 MRI of Plaintiff's left foot revealed soft tissue edema along dorsum of the foot. (Id. at 248, 254, 263, 275.) Plaintiff's tendons and ligaments appeared intact. (Id.) The MRI revealed no

evidence of fracture, bone marrow edema, or erosive disease. (Id.) The reviewing doctor noted that possible causes for the edema included an infection, inflammation, or systemic illness. (Id.)

On December 2, 2005, Plaintiff complained to Dr. Torres of persistent pain in her left foot for "a long time" that was exacerbated by walking. (Id. at 261.) Musculoskeletal examination revealed left MTP tenderness. (Id.) Range of motion of Plaintiff's upper extremities was normal, straight-leg raising was negative bilaterally, and Plaintiff had no vertebral tenderness. (Id. at 261-62.) Dr. Torres diagnosed left foot tendonitis, for which she prescribed Medrol, and inflammatory polyarthritis, for which Plaintiff was to remain on Azulfidine. (Id. at 261-62.) Dr. Torres noted that Plaintiff was taking Azulfidine with excellent tolerance. (Id. at 261.)

In a follow-up appointment with Dr. Torres on January 27, 2006, Plaintiff complained of a "so-so" response with Prednisone in her joints. (Id. at 259.) Plaintiff reported that between all her medications she was able to keep her pain "at a reasonable level and continue to function." (Id.) Range of motion of Plaintiff's upper extremities was normal, straight-leg raising was negative bilaterally, and there was no vertebral tenderness. (Id. at 259-60.) Dr. Torres diagnosed polyarticular arthralgias and recommended that Plaintiff remain on her current medications, as she seemed to be obtaining benefit from them. (Id. at 60.) Plaintiff was currently taking Demerol, Zanaflex, Voltaren and Azulfidine. (Id. at 259.)

Plaintiff visited Dr. Torres on April 21, 2006, Dr. Torres examined Plaintiff for her complaint of pain. (Id. at 257.) Plaintiff reported that she was doing "about the same." (Id.) At the time, Plaintiff was using a TENS Unit[4] and Demerol for pain, but looking for something else to relieve her pain. (Id.) Musculophysical examination revealed lower back tenderness. (Id. at

---

[4] A TENS ("transcutaneous electrical nerve stimulation.") Unit is a small, battery-powered device used to ease chronic pain by blocking pain signals using electrical stimulation. TENS Units are doctor-prescribed. See Ruffalo v. Barnhart, 66 Fed. Appx. 56, 58 (7th Cir. 2003).

258.) Straight-leg raising was negative bilaterally. (Id.) Dr. Torres diagnosed chronic lower back pain due to Plaintiff's degenerative joint disease and polyarticular arthralgias. (Id. at 258.)

## IV. Non-Medical Evidence

Plaintiff moved from New York to Florida sometime in 2002. She has taken a three-hour flight to New York City approximately once a year, including once for each of her hearings with the ALJ in 2005 and 2006. (Id. at 339.) Plaintiff testified in the Second Hearing that she can sit for thirty to forty-five minutes before becoming "fidgety." (Id. at 345.) Plaintiff completed a New York State Office of Temporary and Disability Assistance Division of Disability Determinations questionnaire on August 27, 2002. (Id. at 154-64.) Plaintiff wrote that she walks daily and occasionally drives. (Id. at 164.) She wrote that she tries to be active. (Id.) Plaintiff stated that she is no longer able to bowl or play tennis due to her injury, but has continued her hobbies of reading and playing Scrabble. (Id. at 58.) Plaintiff also wrote that her back pains were dull and intermittent. (Id. at 162.) The pain in her neck was constant, sharp, and radiated to her right hand. (Id. at 162, 163.) Plaintiff wrote that there was no specific activity which brought on the pain. (Id. at 163.)

Plaintiff's official last day of work is unclear from the record. Plaintiff testified that she stopped working in May 2001 (id. at 342), but this is not corroborated by the record. A letter from Dr. Gluck dated July 16, 2001 lists Plaintiff as "presently working." (Id. at 183.) On two Disability Reports for SSA, Plaintiff listed dates worked from "3/88" to "present." (Id. at 138, 146.) One of these reports is undated, and the other is dated August 27, 2002. On her hearing request, Plaintiff stated that she stopped working in June 2003. (Id. at 168.) Moreover, Plaintiff's earnings record reveals earned income of $8,059.00 in 2002, and $1,150.71 in 2003. (Id. at 21.) Plaintiff testified at the Second Hearing that this income was the result of accrued

"holidays and sick leave." (Id. at 343.) It is unclear from the record if Plaintiff was technically employed at that time.

## V. The Second Hearing

At the Second Hearing, Plaintiff testified that her pain was "unbearable." (Id. at 345-46.) Plaintiff wore a TENS Unit for the pain during the hearing. (Id. at 345.) The transcript reveals that towards the end of trial, Plaintiff asked twice in quick succession if she could "just stand up a bit." (Id. at 361.) The ALJ allowed her to stand, but did not inquire further. Plaintiff did not state her reason for wishing to stand.

Dr. Goodman, a non-examining medical expert, testified at the Second Hearing. (Id. at 25, 348-60.) He testified that Plaintiff's multiple symptoms considered together do not meet or equal the equivalent of a disability under Social Security. He reported that inconsistencies in the medical evidence are not conclusive that Plaintiff has an organic pathology present. (Id. at 351.) Dr. Goodman explained that Dr. Torres' diagnosis of poly-articular arthralgias meant pain in many joints. (Id. at 352.) In sum, Dr. Goodman testified that there was no objective medical evidence to support Plaintiff's subjective complaints of pain. (Id. at 356.)

## VI. Standard of Review

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence, or if the decision is based on legal error. See 42 U.S.C. § 405(g); Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998). Substantial evidence is "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). In determining if the Commissioner's decision is supported by substantial evidence, the reviewing court must

"examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Further, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Therefore, when evaluating the evidence, the reviewing court may not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon de novo review. See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).

Under 42 U.S.C. § 405(g), this court has the authority to affirm, reverse, or modify a final decision of the Commissioner, with or without remand. See Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004). Where there are gaps in the administrative record, a remand for further development of the evidence is appropriate. See Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999) (citation omitted). Reversal and entry of judgment for the claimant is appropriate only "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980). Remand is especially appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

## VII. Discussion

### A. The ALJ's Decision

To qualify for disability benefits, a claimant "must be unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting 42 U.S.C. § 423(d)(1)(A) (1994)). The claimant is disabled "only if his

physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Agency rules promulgated under the Act outline a five-step analysis to determine disability. See 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit tracked this analysis in Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000 ), as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not listed in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The

Commissioner bears the burden of proof on the fifth step, while the claimant has the burden on the first four steps.

When proceeding through this five-step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience. See Mongeur, 722 F.2d at 1037. The ALJ's decision becomes the final determination of the Commissioner if the claimant does not appeal the decision or the Appeals Council denies claimant's request for review.

ALJ Weiss acknowledged the five-step sequential analysis in the Second Decision. (Tr. at 21.) First, the ALJ found that Kirby has not engaged in substantial gainful activity since May 18, 2001. (Id.) The ALJ made this finding despite minor residual income in the two years after Plaintiff stopped working. (Id.) Second, ALJ determined that Plaintiff is severely impaired by her C5-6 cervical disc herniation and polyarticular arthralgias. (Id. at 24.) Third, the ALJ found that Plaintiff's impairments, considered singly or in combination, did not meet or equal the requirements of any listed impairment. (Id.) At the fourth step, the ALJ determined that Kirby could not return to her past relevant work as a food service coordinator. The ALJ deemed her past relevant work was exertionally light-to-medium based on Plaintiff's own description and how the work is typically performed in the national economy. (Id.) At the fifth step, on which the Commissioner bears the burden, the ALJ determined that Plaintiff had the residual functional capacity to perform the full range of sedentary work.[5] (Id.) The ALJ cited the findings of Dr.

---

[5] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. 20 C.F.R. § 404.1567(a). At the sedentary level of exertion, periods of standing and walking should generally total no more than about two hours of an eight-hour workday, and sitting should generally total approximately six hours of an eight-hour workday. Social Security Ruling (SSR) 83-10.

Torres, the findings of Dr. Khattak, a statement from Dr. Bressler,[6] the findings of Dr. Schwartz, and Plaintiff's daily living activities as support for the conclusion that Plaintiff had the RFC for the full range of sedentary work. (Id.)

Although some of Plaintiff's treating physicians opined that Plaintiff was "totally disabled," the ALJ determined that these conclusory statements were not entitled to controlling or even great weight, because they were not supported by objective medical evidence and were inconsistent with medical opinions offered by Plaintiff's other treating physicians and Dr. Goodman, the Medical Expert at the Second Hearing. (Id. at 24-25.) The ALJ considered the Plaintiff's subjective complaints of pain, but found that these complaints of pain were disproportionate to what could be reasonably expected based on the objective medical evidence. (Id. at 24.) The ALJ determined that Dr. Goodman's opinion was supported by the record as a whole and afforded considerable weight to Dr. Goodman's opinion. (Id. at 25.) ALJ also considered Plaintiff's daily living activities and found that Plaintiff was not entirely credible. (Id.)

### B. Treating Physician Rule

Plaintiff claims that the ALJ violated the treating physician rule in denying controlling weight to the statements of Dr. Schwartz and Dr. Desroches, two of Plaintiff's treating physicians, and denying controlling weight to Dr. Torres' assessments of Plaintiff's ability to perform work related functions.

The treating physician rule provides that the ALJ must accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques and is consistent "with the other substantial evidence in [the]

---

[6] The ALJ in the Second Decision incorrectly attributes this opinion to Dr. Chehebar. (Tr. at 24.) However, Dr. Bressler, a neurologist associated with Dr. Chehebar's office, wrote this assessment of Plaintiff. (Id. at 170.)

case record." See Clark, 143 F.3d at 118 (discussing 20 C.F.R. § 404.1527(d)(2)). If a treating physician's diagnosis is inconsistent with the rest of the record, the treating physician's opinion generally will not be given controlling weight. See Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008). If the opinion of a treating physician as to the nature and severity of a claimant's impairment is not well-supported by objective medical evidence, the obligation to give controlling weight to the opinion is inapplicable. See Schnetzler v. Astrue, 533 F. Supp 2d 272, 286 (E.D.N.Y. 2008). Therefore, a treating physician's conclusory statement that the claimant is disabled cannot itself be determinative if this claim is not supported by objective medical evidence or is inconsistent with other substantial evidence in the case record. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

When the ALJ chooses not to give a treating physician's opinion controlling weight, he must give "good reasons" for doing so. See Clark, 143 F. 3d at 118. Factors to be considered are: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998). The ALJ's decision to discount a treating physician's opinion is entitled to deference, where such decision is based on inconsistent medical evidence. See 42 U.S.C. § 405(g).

In the present case, two of Plaintiff's treating doctors made conclusory statements that Plaintiff was disabled. Dr. Schwartz and Dr. Desroches wrote in letters that Plaintiff was "totally disabled" and "unable to do any kind of work." (Tr. at 229, 244.) Additionally, Dr. Torres, in an assessment of Plaintiff's ability to do work-related activities, concluded that Plaintiff was unable to perform sedentary work. (Id. at 245-46.) However, these claims are not supported by

objective medical evidence and are inconsistent with the record as a whole. Due to these conflicts in the record, the court cannot hold that the ALJ was required to grant controlling weight to the opinions of these treating physicians.

Dr. Desroches's letter of March 29, 2003 stating that Plaintiff was "totally disabled" is inconsistent with the objective medical evidence. (Id. at 244.) The ALJ wrote in the Second Decision that Dr. Desroches opinion is not supported by the record. (Id. at 25.) A full review of the record supports the ALJ's determination: Dr. Desroches referenced a lumbar MRI[7] from that same day that was normal. (Id. at 244.) Dr. Desroches also noted in this letter that Plaintiff had difficulty walking properly. (Id.) This statement is also inconsistent with the record as a whole. No other physician noted that Plaintiff had any difficulty walking: on June 27, 2001, Dr. Chehebar noted that Plaintiff's gait tested normally. (Id. at 171, 238.) Dr. Torres noted in December 2003 and January 2005 that Plaintiff could walk up to thirty minutes. (Id. at 220-22, 245-46.) Dr. Schwartz noted that Plaintiff's gait was not abnormal (id. at 198), and that Plaintiff required no assistive devices to ambulate (id. at 202). On August 27, 2002, Plaintiff herself described walking as one of her daily activities. (Id. at 164.)

Dr. Schwartz, another of Plaintiff's treating physicians, wrote on April 4, 2003 that Plaintiff was "unable to do any kind of work due to the work-related accident on June 21, 2001." (Id. at 229.) The ALJ explained that this statement is not supported by the record. (Id. at 25.) A review of the record reveals that this statement is inconsistent with Dr. Schwartz's clinical findings from the examination on August 20, 2002. (Id. at 196-203.) There, he reported no finding of muscle spasm; no sensory, motor or reflex deficits; no atrophy and no "swelling or abnormality." (Id. at 197.) Dr. Schwartz reported that Plaintiff's range of motion was good

---

[7] Though documentary evidence of the March 29, 2003 lumbar MRI is not included in the record, both Dr. Desroches and Dr. Jeret, neurologist, reference it as "normal." (Tr. at 223.)

except on extremes. (Id. at 196-202.) Dr. Schwartz assessed that Plaintiff could stand, walk, or sit up to eight hours in an eight-hour workday, and lift and carry up to fifteen pounds. (Id. at 199.) This assessment is consistent with the ALJ's determination that Plaintiff could perform the full range of sedentary work. Moreover, this letter is inconsistent with Plaintiff's testimony. Plaintiff never claimed to have suffered a "work-related accident." Instead, Plaintiff submitted Dr. Koppel's opinion that her injuries were "cumulative stress disorders" of gradual onset. (Id. at 236.)

ALJ Weiss explained his reasoning for not granting controlling weight to Dr. Torres's assessment of Plaintiff's ability to perform work-related functions. (Id. at 25.) A review of the full record supports the ALJ's determination. Though Dr. Torres is Plaintiff's most regular treating physician, her assessment of Plaintiff is inconsistent with the rest of the record, specifically with Dr. Schwartz's above-mentioned assessment. Dr. Schwartz's assessment of Plaintiff's ability to perform work-related functions is consistent with the full range of sedentary work. (Id. at 196-203.) Dr. Torres diagnosed Plaintiff with poly-articular arthralgias (id. at 273) and degenerative disc disease (id. at 288). Dr. Goodman, the medical expert at the Second Hearing, translated as poly-articular arthralgias as discomfort in many joints, which could lead to varying intensities of pain. (Id. at 352.) However, Dr. Goodman testified that Plaintiff's pain was a subjective symptom that did not necessarily result from a single organic pathology. (Id. at 350-51.) Moreover, treating physician Dr. Torres noted that Plaintiff's degenerative disc disease was "significantly asymptomatic" and noted that she would continue to monitor Plaintiff's condition. (Id. at 282.) Further, as Dr. Goodman testified, Dr. Torres' assessments of "atrophy" are not entitled to controlling weight because they are not supported by diagnostic analysis or measurements. (Id. at 358.)

Finally, Plaintiff's own statements to Dr. Torres undermine her claims. Dr. Torres noted that Plaintiff stated on August 11, 2004 that her neck and lower back discomfort were not "making her dysfunctional." (Id. at 281.) On April 20, 2005, Dr. Torres noted that Plaintiff stated that she "remained well." (Id. at 268.) On January 27, 2006, Plaintiff reported to Dr. Torres that "between all her medications she is able to keep her pain at a reasonable level and continue to function." (Id. at 259.)

The ALJ did not violate the treating physician rule in the Second Decision. The ALJ gave good reason for granting less weight to the opinions of Plaintiff's treating physicians, Drs. Schwartz, Desroches, and Torres. Further, the ALJ explained the weight granted to Medical Expert Dr. Goodman. However, as explained below, the ALJ did not explain the weight granted to consultative examiner Dr. Khattak.

### C. Plaintiff's Credibility and Subjective Experience of Pain

Under appropriate circumstances, the subjective experience of pain can support a finding of disability. See Gallagher ex rel. Gallagher v. Schweiker, 697 F.2d 82, 83 (2d Cir. 1983). However, the "ALJ must assess subjective evidence in light of objective medical facts and diagnoses." See Williams ex rel. Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988). Plaintiff's subjective experience of pain must be supported by "medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain." 20 C.F.R. § 404.1529(a). "The Commissioner does not have to accept plaintiff's subjective testimony about her symptoms without question," and should determine a plaintiff's credibility in light of all the evidence. Kendall v. Apfel, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998) (internal quotation omitted). If a plaintiff's claims of pain disproportionately exceed a level supported by objective medical evidence, the ALJ must

examine additional factors. These factors include (1) the plaintiff's daily activities; (2) the nature, onset, duration, frequency, radiation of the pain and other symptoms; (3) precipitating or aggravating factors; (4) type, dosage, effectiveness and adverse side-effects of medication that the claimant has taken to alleviate the pain; (5) treatment, other than medication, for relief of pain; and (6) any measures which the claimant uses or has used to relieve her pain or other symptoms. See 20 C.F.R. § 404.1529(c)(3). Ultimately, however, deciding the credibility of the plaintiff is the function of the ALJ, not the reviewing court. See Aponte v. Sec'y of Health & Human Serv., 728 F.2d 588, 591 (2d Cir. 1984).

At the Second Hearing, Plaintiff testified to pain in the right side of her neck (Tr. at 343), lower back (id. at 345), left leg (id. at 344), and numbness and pain in the fingers of her right hand (id. at 343). Plaintiff further testified that this pain was "unbearable," and she was wearing a TENS Unit during the Second Hearing to relieve the pain. (Id. at 345-46.) The ALJ considered Plaintiff's claims of pain and functional limitation, and found them disproportionate to what could be reasonably expected from the objective medical evidence. (Id. at 25.) The ALJ noted that Plaintiff was engaging in a "reasonable range of daily living activities;" she was independent in self-care and maintaining her household. (Id. at 25.) He specifically noted that Plaintiff had traveled by airplane from Florida to New York occasionally during the previous four years; this trip takes approximately three hours, a fact which the ALJ claimed undermines Plaintiff's claims of not being able to sit continuously for longer than a period of thirty-to-forty-five minutes. (Id. at 23.) The ALJ also noted that Plaintiff admitted to driving a motor vehicle despite her complaints of arm and shoulder pain. (Id.) Additionally, the ALJ noted that Plaintiff gave no indication of pain or discomfort throughout the course of the hearing. (Id.) This court

notes that the transcript of the hearing reflects that Plaintiff requested to stand, but did not mention pain as a reason for this request. (Id. at 361.)

The record indicates that Plaintiff's treating physicians have prescribed a course of treatment which has controlled Plaintiff's pain. Dr. Torres noted on July 6, 2004 that Plaintiff achieved pain relief for her left shoulder through massage and stretching. (Id. at 283.) On August 11, 2004, Dr. Torres noted that Plaintiff's lower back pain was "stable on present medications." (Id. at 282.) Plaintiff reported to Dr. Torres on April 20, 2005 that her short course of Prednisone "completely resolved her stiffness" and improved her pain. (Id. at 268.) On January 27, 2006, Dr. Torres noted that Plaintiff seemed to be "obtaining benefit" from her current medications. (Id. at 260.) Also, as noted above, Dr. Torres regularly noted Plaintiff was in "no obvious discomfort." (Id. at 288, 286, 270, 249, 259.)

Plaintiff also indicated that she has found non-medical means to relieve her pain. Plaintiff stated on her New York State Office of Temporary and Disability Assistance questionnaire that she obtained some relief by squeezing her right hand or using a Homedics massage therapy device on her back and hand. (Id. at 163.) Plaintiff stated in her function report from August 2002 that she performed therapeutic exercises on a daily basis. (Id. at 155, 164.)

According to Dr. Goodman, the Medical Expert at the Second Hearing, there is no objective evidence of impairment which could reasonably be expected to produce Plaintiff's claimed amount of pain. Under 20 C.F.R. § 404.1529(a), the absence of such findings precludes a determination of disability grounded on subjective pain. See Snell, 177 F.3d at 135.

The evidence supports the ALJ's decision that Plaintiff was not entirely credible. There are several inconsistencies in the record regarding the date that Plaintiff stopped working: Plaintiff testified at the Second Hearing that she stopped working in May 2001. (Tr. at 342.) A

letter from Dr. Gluck dated July 16, 2001 lists Plaintiff as "presently working." (Id. at 183.) On two Disability Reports for SSA, Plaintiff listed "3/88" to "present." (Id. at 138, 146.) One of these reports is undated; the other is dated August 27, 2002—over a year after Plaintiff testified that she stopped working. (Id. at 146-53.) On her hearing request, Plaintiff listed that she stopped working in June 2003. (Id. at 168.) Plaintiff accounted for her 2002-2003 income at the Second Hearing, testifying that the earnings reflected compensation for "holidays and sick leave." (Id. at 342-343.) As the ALJ noted in the Second Decision, these earnings did not rise to the level of substantial gainful activity, but did adversely affect Plaintiff's credibility. (Id. at 21.) This court defers to the ALJ's credibility assessment. See Aponte, 728 F.2d at 591.

### D. ALJ's Reliance on Dr. Khattak

Plaintiff argues that the Second Decision should be reversed because the ALJ improperly relied on Dr. Khattak's one-time, consultative opinion. This opinion stated that Plaintiff was not limited with regard to sitting or standing. (Tr. at 204-05.) In support of this argument, Plaintiff cites to a decision from this court, Lamar v. Barnhart, 373 F. Supp. 2d 169 (E.D.N.Y. 2005), which described one of Dr. Khattak's reports as "slipshod and specious." Id. at 177. Plaintiff also submits a memorandum from the Acting Regional Chief ALJ in Region II ("ALJ Memorandum") which states that Dr. Khattak was removed as consultative examiner on behalf of the SSA in July 2005. The ALJ Memorandum explains that reports from Dr. Khattak need not be expunged from the record, but it directs ALJs to specially consider and give appropriate weight to such reports. (Tr. at 10.) The ALJ Memorandum directs that the ALJ should explain the weight given to any report from Dr. Khattak. (Id.)

The amount of weight the ALJ granted to the opinion of Dr. Khattak is unclear from the Second Decision, and therefore a determination of whether the ALJ improperly relied on Dr.

Khattak's report is inconclusive. The ALJ mentions Dr. Khattak's opinion without any indication of awareness that Dr. Khattak has been discredited. While the ALJ satisfactorily explains the weight given to Plaintiff's treating physicians, the ALJ does not explain the weight given to the opinion of Dr. Khattak. According to the ALJ Memorandum, mere mention of Dr. Khattak's medical opinion as one of a cohort of physicians need not automatically merit a reversal or remand, so long as it is accompanied by an explanation of the weight granted to the opinion. (Id.)

In the present case, Dr. Khattak's findings from the one-time consultative examination were similar in many regards to the findings of Plaintiff's other treating physicians. Dr. Khattak found that Plaintiff's straight-leg raising was negative bilaterally. (Id. at 204.) Examinations by Dr. Torres, a treating physician, revealed the same finding on numerous examinations. (Id. at 284, 286, 273, 270, 268, 262, 260.) Dr. Khattak found no muscle atrophy and no sensory or motor deficits. (Id. at 204.) Plaintiff's treating physician Dr. Schwartz also found no muscle atrophy (id. at 197), and no physician noted sensory or motor deficits. Dr. Khattak's examination revealed no cervical spasm or tenderness. (Id. at 204.) The results of Dr. Torres and Plaintiff's chiropractor, Dr. Koppel, are equivocal. Dr. Koppel noted cervical tenderness upon examination on May 18, 2001 (id. at 236), and Dr. Torres twice noted vertebral tenderness on January 6, 2005 and April 21, 2006 (id. at 273, 257). However, Dr. Torres found no vertebral tenderness in three examinations on April 20, 2005, December 2, 2005, and January 27, 2006. (Id. at 268, 262, 260.) Dr. Khattak reported that Plaintiff's upper extremity range of motion was normal. (Id. at 204.) Dr. Torres reported this same finding upon numerous examinations. (Id. at 288, 281, 272, 270, 266, 268, 265, 249, 255, 264, 261, 259.) Moreover, this same finding was

made by the SSA examining physician (id. at 209), and Plaintiff's treating physician, Dr. Gluck (id. at 183).

In addition to the memorandum from the Acting Regional Chief ALJ, Plaintiff has noted this court's opinion on June 21, 2005 "questioning the state's continued reliance on Dr. Khattak's 'medical' opinions." Lamar, 373 F. Supp. 2d at 177. This court directed that the Commissioner forward a copy of the Memorandum and Order to the appropriate New York State authorities to take appropriate action. Id.

Finally, the DDS Physician wrote in Plaintiff's RFC assessment on October 8, 2002 that the opinion of Dr. Khattak was of "little probative value" because it was vague. (Tr. at 212.) Because the ALJ did not reference this RFC assessment in his decision, the presence of this notation is inconclusive in determining whether the ALJ improperly relied on the report of Dr. Khattak.

However, given the explicit instructions from the Acting Regional Chief ALJ issued more than five months prior to the Second Hearing and nearly nine months prior to the issuance of the Second Decision, the lack of explanation regarding the weight given to Dr. Khattak's opinion necessitates remand for clarification.

### E. Commissioner's Burden at Step Five

Plaintiff argues that the Commissioner has not met his burden at the fifth step of the sequential analysis to prove that Plaintiff has the RFC to perform the full range of sedentary work. Plaintiff claims that Commissioner has not met this burden due, in part, to improper reliance upon the report of Dr. Khattak. Moreover, Plaintiff suggests that the ALJ improperly ignored evidence from Plaintiff's treating physician indicating that Plaintiff could not work on a full-time basis.

In step five of the sequential analysis, the ALJ found that Plaintiff could perform the full range of sedentary work. (Tr. at 24.) Although "[s]edentary work is the least rigorous of the five categories of work recognized by SSA regulations," Schaal, 134 F.3d at 501 n.6, "by its very nature 'sedentary' work requires a person to sit for long periods of time even though standing and walking are occasionally required," Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983). According to the SSA, sedentary work "generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day." Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) (citing SSR 83-10). Sedentary work also involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). To decide that a claimant can perform the full range of sedentary work, the ALJ must find that claimant can perform these functions on a regular and continuing basis. See Johnson v. Apfel, 1998 U.S. Dist. LEXIS 9939, at *18-19 (E.D.N.Y. 1998). SSR 96-8p states that "A 'regular and continuing basis' means eight hours a day, for five days a week, or an equivalent work schedule."

This court agrees with Plaintiff that the Commissioner erred in determining that Plaintiff is capable of performing the full range of sedentary work. The determination that Plaintiff was able to perform the full range of sedentary work is not supported by substantial evidence. The burden at step five "requires the Commissioner to prove that [plaintiff] can sit for the requisite number of hours per day." Curry v. Apfel, 209 F.3d 117, 123 n. 1 (2d Cir. 2000). Plaintiff testified that she could only sit for up to forty-five minutes before she gets "fidgety." (Tr. at 345.) Dr. Torres' most recent assessment of Plaintiff's ability to perform work related activities supports her claim, stating that Plaintiff can sit for a total of four hours in an eight-hour workday, but only for thirty minutes without interruption. (Id. at 245.) Though the ALJ appropriately

explained why he granted Dr. Torres' assessment less weight, the ALJ offers no evidence from the record which conclusively shows that the Plaintiff is capable of performing the full range of sedentary work on a regular and continuing basis.

There is not substantial evidence to support the ALJ's determination that Plaintiff can perform the full range of sedentary work. The ALJ relied on the fact that Plaintiff had taken a three-hour flight approximately once a year as evidence undermining Plaintiff's claims that she could only sit for thirty-to-forty-five minutes at a time. (Id. at 23.) It is not reasonable to infer from such a flight that Plaintiff could sit for six hours a day on a on a regular and continuing basis. On such a flight, Plaintiff could recline or stand as necessary. The ALJ also wrote that the Plaintiff sat through the hearing without any signs of discomfort. (Id.) This ignores the Plaintiff's testimony that she was wearing a TENS Unit to control her pain during the hearing and Plaintiff's requests to "just stand up a bit" towards the end of the hearing. (Id. at 361.) The ALJ did not cite Dr. Schwartz's August 30, 2002 assessment that Plaintiff could walk, stand or sit for eight hours in an eight-hour workday to support his determination. (Id. at 199.) The ALJ noted that Dr. Torres observed that Plaintiff was "in no obvious discomfort" at each of her visits (id. at 288, 286, 270, 249, 259), and that Dr. Torres twice noted that Plaintiff's degenerative disc disease was "asymptomatic" (id. at 284, 282). However, this evidence is not sufficient to bear the burden of proof that Plaintiff can perform the full range of sedentary work.

**VIII. Conclusion**

For the reasons set forth above, the case is REMANDED for further proceedings in accordance with this Memorandum and Order. The ALJ is instructed to clarify the weight given to the opinion of Dr. Khattak and to set forth additional facts supporting his determination that Plaintiff could perform the full range of sedentary work.


SO ORDERED.

Dated: Brooklyn, New York
     July 8, 2009

_s/ NGG_____
NICHOLAS G. GARAUFIS
United States District Judge